**UNITED STATES of America**

v.

**Lorne COATES and Michelle Dillard, Defendants.**

**No. 90 Cr. 105 (KTD).**

United States District Court, S.D. New York.

May 11, 1990.

148

to possess with intent to distribute 500 grams or more of cocaine, and (2) possessing with intent to distribute 4,018 grams of cocaine, within 1,000 feet of a school, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 845a(a). The defendants were arrested in the Amtrak section of Pennsylvania Station in Manhattan. Coates and Dillard both move to suppress all evidence and property, including the cocaine, obtained by the Government in this case, as fruits of an allegedly unlawful investigatory stop and subsequent search of their travelling bags and persons in violation of the Fourth Amendment. Both Dillard and Coates also seek to dismiss that part of count two of the indictment, the "schoolhouse" charge, that arises from the presence, within 1,000 feet of their arrest, of the Taylor Business School, a vocational school located at One Penn Plaza, New York, New York.

A one-day suppression hearing was held on May 8, 1990, and I reserved judgment at that time. Both suppression motions are now denied. Coates' and Dillard's motion to dismiss the schoolhouse charge in count two of the indictment, however, is granted.

## FACTS

On January 25, 1990, Captain Steven Goldstein of the Drug Enforcement Unit of the Amtrak Police Department was working with Officer Louis Coiro on the upper-level concourse of Penn Station. Both were in plainclothes and carried guns in shoulder holsters concealed beneath their jackets. Goldstein testified that at approximately 11:50 a.m., he and Coiro observed Coates and Dillard standing "around one of the gates", about twenty to thirty feet away. They were engaged in conversation. Coates was carrying a tweed shoulder bag and Dillard was carrying a matching tweed garment bag. Goldstein further testified that he observed Coates looking around "furtively," appearing nervous, as if surveilling the station. Coates glanced at the officers, and then quickly away. Goldstein observed Coates and Dillard in this manner for approximately three to five minutes.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for U.S.; Jonathan Rosenberg, Asst. U.S. Atty., of counsel.

Joseph Greenwald & Laake, Greenbelt, Md., for defendant Lorne Coates; Fred R. Joseph, of counsel.

Joseph & Stalonas, New York City, for defendant Michelle Dillard; Michael P. Joseph, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Defendants Lorne Coates and Michelle A. Dillard are charged with (1) conspiracy

When the gate for a departing train was announced, Coates and Dillard walked together towards the down escalator for gate 13–14. The announced train, bound for Washington D.C., was scheduled for a stop in New Carrollton, Maryland. Just prior to reaching the gate, Coates looked back at the officers and then away. Goldstein then went to the railing by the gate and watched them descend the escalator toward the train. Again, Coates looked up in Goldstein's direction, and then quickly away. Coates then leaned over to say something to Dillard.

Goldstein summoned Coiro and decided to investigate further. The officers observed Coates and Dillard board the train, entering through the rear door of the railway car. The officers entered the front end of the car. It was a regular Metroliner car, with no reserved seating. Coates and Dillard were not seated together, although there were adjoining seats available. Dillard was seated across the aisle from Coates, approximately five rows in front of him. Both pieces of luggage, the tweed shoulder bag that had been carried by Coates and the tweed garment bag carried by Dillard, were stored in the luggage rack above Coates' head.

The officers walked down the aisle, passing both Coates and Dillard. Coiro told Goldstein that Dillard turned her head and watched Goldstein walk by. Based on these circumstances, Goldstein testified that he decided to approach Coates to see if he would consent to speak with him. Goldstein walked up to Coates, identified himself as a police officer, but not as someone involved with the drug interdiction program, and asked Coates if he would mind speaking to him. Coates consented to the interview.

Goldstein asked Coates where he was going, and Coates told him to New Carrollton. Goldstein asked to see his ticket, and Coates produced it. The ticket was issued in the name of Kim Jones, and indicated that it had been paid for in cash. Goldstein then asked Coates for the identity of "Kim Jones." Coates responded that it was his wife. Goldstein asked Coates for identification, and Coates said he had none. When Goldstein asked him if he was travelling with anyone, Coates said no. Goldstein then asked him if the luggage above his head, which at that point appeared only to be the garment bag, on top of and covering the shoulder bag, was his. Coates replied that it was. Goldstein then told Coates that he was with the drug enforcement agency working in Penn Station, and with that in mind, would he consent to a search of his bag. Coates refused, stating that Goldstein needed a warrant.

Goldstein then approached Dillard, identified himself, and requested permission to speak to her. Dillard also consented to the interview. Goldstein asked her if she was travelling with anyone, and she said no. He then asked to see her ticket, and she produced a ticket that was also in the name of Kim Jones and identical to the one produced by Coates. When Goldstein asked her if she was Kim Jones, she replied that she was not. Goldstein then asked for her identification, and she produced a driver's license in the name of Michelle A. Dillard. Goldstein asked her if she had any luggage, and she pointed to only her handbag and bookbag. He asked her again if she was travelling with anyone, and then pointed to Coates and stated that both of them had tickets issued under the same name. Dillard responded that she knew Coates but that they were not travelling together.

Goldstein then walked back to Coates and reached up to the garment bag. Upon moving it he noticed the shoulder bag, which Coates had been carrying when he entered the train. Goldstein asked Coates if the shoulder bag was his, and Coates responded that it was not. He then asked Dillard if it was hers, and she said it was not. Goldstein then held the shoulder bag aloft and asked aloud whether anyone in the car owned the bag. After receiving no response, Goldstein opened the shoulder bag and discovered a heavily wrapped brown package inside. Goldstein made a slit in the package and found white powder. Two more similar packages were in the bag. Goldstein closed the shoulder bag and told Coiro to place Coates under arrest.

Once Coates was secured by Coiro, Goldstein took the unopened garment bag over to Dillard. Dillard, although not under arrest, told Goldstein that she wanted to go with him to Amtrak Police headquarters to see if Coates was all right. At that point, Goldstein testified, Dillard was not under arrest and was free to go, but that he intended to hold on to the garment bag. At police headquarters, one level above the train platform, Goldstein conducted an inventory search of Coates' property, including the garment bag that Coates had identified as his while still on the train, but that had originally been carried by Dillard onto the train. Inside the garment bag, Goldstein discovered a similar brown package of cocaine. Dillard was then placed under arrest.

Both Coates and Dillard were read their Miranda rights and searched, and all their personal belongings were collected. Coates had on him approximately $122.60 and a beeper. Dillard had, among other things, a wallet, a checkbook, a 1988–89 monthly academic calendar, and a 1989–90 weekly minder.

Coates testified at the hearing that Goldstein stood in close proximity to him during the interview on the train. According to Coates, Goldstein leaned down within six inches of his face as he was questioned. Coiro stood directly behind Goldstein in the aisle. Coates also testified that Coiro had his hand in his jacket, and that he could see a gun handle sticking out. Coates further stated that Goldstein told him to show him his ticket or Goldstein would throw him off the train. He averred that when he tried to stand up, he was told to sit back down. Furthermore, Coates testified that he told Goldstein that he owned both bags, and that Goldstein never held the shoulder bag up to ask others in the car if it was theirs. Coates added that Goldstein never asked with whom Coates was travelling. Finally, he stated that Goldstein told him "I can do what I want" because he worked for the drug enforcement agency of Amtrak, and proceeded to open the shoulder bag. On cross-examination, Coates testified that his wife's name was Sabrina Coates, not Kim Jones, that "Kim Jones" was "just a name"

that Coates and Dillard had used, and that Coates and Dillard were in fact travelling together. Dillard did not testify at the hearing.

## DISCUSSION

### I. Suppression Motion

■ A person is "seized" for Fourth Amendment purposes "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Mere questioning of an individual by police in a public place does not rise to the level of a "seizure" within this standard, unless additional circumstances exist which make it reasonable for the individual to believe his liberty has been restrained. *Id.* at 552, 100 S.Ct. at 1876. Examples of circumstances that may indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554, 100 S.Ct. at 1877.

■■ However, police questioning " 'by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.' " *United States v. Moreno,* 897 F.2d 26, 30 (2nd Cir.1990) (quoting *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984)). Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering evidence in a criminal prosecution of his voluntary answers to such questions. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). Nor would the fact that an

officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring objective justification. *Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877.

■ To the extent that Coates' testimony conflicts with Goldstein's, I credit Goldstein's testimony. In rejecting Coates' testimony, I find that the officers did not act in an aggressive, overbearing, or coercive manner that could have reasonably lead Coates and Dillard to believe that their freedom was restrained. The encounter occurred in a public place, in front of other passengers. The questioning was brief and pointed, and no show of force was used or threatened to obtain Dillard's and Coates' consent to the interview.

As such, I find that the officer's questioning of Coates and Dillard did not rise to the level of a seizure here. Similar to the facts in *Mendenhall,* Coates and Dillard were approached in a public area by agents in plainclothes who did not appear to be wearing arms; the officers did not crowd tightly around the defendants or otherwise obstruct their freedom of movement; they identified themselves as law enforcement agents; and they asked, without raising their voices and without a show of coercion, if they could speak with the defendants.

■ It is also clear that Coates' and Dillard's consent to the interview was given voluntarily, as determined by the "totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Defendants need not be instructed that they have a right to refuse consent to an interview. *Id.* at 227, 93 S.Ct. at 2047. Here, Goldstein identified himself as a police officer, asked permission to speak with Coates and Dillard, and did not restrict their freedom of movement. There is no credible evidence establishing duress. Both Coates and Dillard responded affirmatively when asked whether they consented to be interviewed. There was neither extended questioning nor any overt act or speech that could fairly be construed as detaining them. Nor was there any physical contact, deprivation, or threat. Moreover, neither Coates nor Dillard make any claim based on youth, lack of education, or experience. *See id.* at 226, 93 S.Ct. at 2047.

■ Even assuming that the questioning of Coates and Dillard rose to the level of an investigatory *Terry* stop, the officers' actions nonetheless satisfied constitutional strictures because the record indicates that they had sufficient grounds for suspicion to justify such a stop. While officers "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch,'" the Fourth Amendment requires only a "minimum level of objective justification" for making a stop, and far less proof of wrongdoing than necessary to establish probable cause. *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)). Limited stops by law enforcement officers to investigate those suspected of wrongdoing are permissible "seizures" within the Fourth Amendment, provided that the officers can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (footnote omitted).

■ Although the actions of Coates and Dillard, such as scanning the crowd of a busy train station, may have innocent explanations, courts in determining the existence of "reasonable suspicion" should view the circumstances "'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *United States v. Oates,* 560 F.2d 45, 61 (2nd Cir.1977) (quoting *United States v. Magda,* 547 F.2d 756, 758 (2nd Cir.1976)). Here, Goldstein, an experienced narcotics officer, observed a pattern of activity that his training and knowledge indicated was often used in narcotics trafficking. Goldstein had reasonable suspicion to question Coates and Dillard briefly based on several distinct circumstances. Coates repeatedly scanned the crowd while standing next to Dillard in the train station, as if searching out the presence of surveil-

lance. Coates responded nervously upon spotting Coiro and Goldstein, and then communicated with Dillard.

Moreover, Coates' and Dillard's behavior inside the train provided further suspicion to justify continuing the questioning. Dillard and Coates sat some distance apart in the car, although obviously travelling together, and despite the existence of several empty seats adjoining one another. In addition, the fact that they were travelling to the same place, with tickets purchased in cash that same day in the name of the same individual, "Kim Jones," and their continued unwillingness to say they were travelling together, provided additional justification for an investigative "stop."

■■■■ In addition, both Coates and Dillard denied ownership of, and therefore abandoned, the tweed shoulder bag. A defendant cannot challenge the search and seizure of objects that he has voluntarily abandoned. *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Although Coates told Goldstein that the garment bag was his, and that Goldstein needed a warrant to search it, Coates and Dillard both stated that the shoulder bag did not belong to them. Even after Goldstein held the shoulder bag aloft and asked whether anyone in the car owned it, neither Coates nor Dillard claimed ownership. Thus Goldstein's search of the shoulder bag was proper, formed a more than sufficient basis for Coates' arrest, and the three kilograms of cocaine found in it should not be suppressed.

■■■■ Similarly, the inventory search of the garment bag was proper. The garment bag was not opened on the train, but at the stationhouse after Coates had been arrested and placed in a holding area. Coates had explicitly claimed the garment bag to be his. Police officers are entitled under the Fourth Amendment to conduct a warrantless search of the personal effects and baggage of a person under lawful arrest as part of routine administrative procedure incident to booking and jailing a suspect. *See United States v. Arango–Correa*, 851 F.2d 54, 59 (2nd Cir.1988). The officers' discovery of drugs in the garment bag, which Dillard had carried onto the train, was also amply sufficient grounds to form the basis of her arrest.

■■■■ Coates also seeks to suppress a beeper found on him after his arrest, while Dillard seeks to suppress an address book, monthly academic calendar, 1989–90 weekly reminder, and checkbook found on her. The totality of the circumstances set forth above, however, gave rise to ample probable cause for the arrest of both Coates and Dillard. As such, the subsequent search of them incident to their arrest and the inventory logging of their belongings were proper.

## II. The "Schoolhouse" Charge

■■■■ Coates and Dillard also move to dismiss that part of count two of the indictment that constitutes a "schoolhouse" charge, arguing that such charge is inapplicable to the facts here. Section 845a of Title 21 enhances the penalty for those found guilty of certain narcotics crimes committed within 1,000 feet of a school. Subsection (a) of the statute, as amended in 1986 and 1988, includes those "possessing with intent to distribute ... a controlled substance" within a thousand feet of "the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university." Violation of this section is punishable

> (1) by a term of imprisonment, or fine, or both up to twice that authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense. Except to the extent a greater minimum sentence is otherwise provided by section 841(b) of this title, a term of imprisonment under this subsection shall not be less than one year.

The Second Circuit found the statute's clear purpose as follows:

> Congress sought to create a drug-free zone around schools; whether it chose to do so directly or indirectly is not particularly relevant. According to its sponsor, the provision was designed to "deter

drug distribution in and around schools," including transactions which "take place in remote outdoor areas, at local hangouts, or at nearby homes or apartments," thereby helping to "eliminate outside negative influences" around schools. *United States v. Falu,* 776 F.2d 46, 50 (2nd Cir.1985) (citations omitted).

Coates was arrested on board a train and Dillard in the lower level of Penn Station, in possession of a total of four kilograms of cocaine. Penn Station is within 1,000 feet of the Taylor Business School, which is a technical school located in Penn Plaza, an office complex above and adjoining the station. It is clear that Coates and Dillard were in Penn Station simply because that is where trains bound to Washington, D.C. and elsewhere are regularly scheduled. There is no evidence that they were in Penn Station to distribute cocaine within 1,000 feet of a school, or, for that matter, to distribute cocaine within New York State at all. Indeed, Coates testified on cross-examination that he and Dillard were transporting the cocaine to Maryland.

To charge a schoolyard count in these circumstances stretches the scope of the statute beyond logical and acceptable bounds. The statute cannot be meant to reach the circumstance of Coates' and Dillard's presence, undoubtedly unknowing, within a 1,000 feet of a school while ensconced in a railway car. To posit liability under § 845a in these fortuitous circumstances is simple overreaching. To hold otherwise would be to mandate charging a schoolhouse count every time defendants on trains, or any other means of transportation, speed by a school on their way to a narcotics sale. *See United States v. Liranzo,* 729 F.Supp. 1012 (S.D.N.Y.1990) (dismissing schoolhouse count as to defendant arrested in Port Authority bus terminal while en route to Pennsylvania).[1] As such, I find the schoolhouse statute inapplicable to the facts of this case.

In sum, Coates' and Dillard's motion to dismiss the charge in the second count of the indictment that they violated the schoolhouse statute, 21 U.S.C. § 845a(a), is granted. Their suppression motion is denied in all respects.

SO ORDERED.

---

**1.** I do not reach the issue of overbreadth of the statute raised by Coates and Dillard because I find that on these facts, the schoolhouse statute is inapplicable.