FILED
COURT OF APPEALS
DIVISION II

2013 APR -2 AM 8: 47

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42315-4-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JESUS M. VILLARREAL, | |
| Appellant. | |

BRIDGEWATER, J.P.T.[1] — Jesus Villarreal appeals his conviction for unlawful

possession of methamphetamine with intent to deliver within 1,000 feet of a school. We

hold that, at a suppression hearing, the trial court did not abuse its discretion in admitting

hearsay testimony and did not violate Villarreal's right to confront witnesses. The trial

court did not err in denying Villarreal's motion to suppress evidence because his

investigatory detention under Terry[2] and the subsequent search of his bag were lawful

because he took the bag from a truck parked at a known drug house, acted suspiciously

by dropping it when he noticed an approaching police officer, and consented to the bag's

search. We also hold that the trial court did not abuse its discretion in admitting expert

testimony on methamphetamine distribution and usage. Further, sufficient evidence

supported Villarreal's conviction because he actually held the bag with the

methamphetamine, had a large amount of money with him, and abandoned the bag with

---

[1] Judge C. C. Bridgewater is serving as a judge pro tempore of the Court of Appeals, Division II, pursuant to CAR 21(c).

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

the drugs upon seeing the police. The prosecutor did not commit misconduct during closing by inviting the jury to make rational inferences from the evidence. Finally, Villarreal insufficiently briefed his unspecified "constitutional" challenge to RCW 69.50.435(1)(d), the school grounds sentence enhancement statute; although we could refuse to consider it, we deem his argument to be one of equal protection that fails. Accordingly, we affirm his conviction and sentence.

FACTS

I. SUPPRESSION HEARING

After Villarreal's May 25, 2010 arrest, the State charged him with unlawful possession of methamphetamine with intent to deliver, plus a school grounds aggravating factor. Villarreal moved before trial to suppress evidence obtained subsequent to his detention by law enforcement officers.

Kelso Police Department Sergeant Kevin Tate testified at the suppression hearing. According to Tate, on May 25, 2010, at approximately 9:00 or 10:00 PM, the Cowlitz-Wahkiakum Task Force conducted a controlled buy of methamphetamine at the 99 Home Court residence of Victoria Ortega-Berrara. Afterward, Tate returned to the Kelso Police Department to author search warrant affidavits. Other law enforcement officers kept the residence under surveillance until Tate could obtain a warrant.

Tate testified that, at some point between 10:00 PM and 1:00 AM, surveillance officers informed him that someone who "looked like a male" had "left the house," accessed a truck in the residence's driveway, removed an object from the truck, and began walking away. Report of Proceedings (RP) at 6-8. Based on concerns that anyone leaving the residence might remove

2

evidence related to the investigation, flee, or compromise the investigation by discovering surveillance, Tate "directed that someone" contact Villarreal. RP at 5-9.

According to Longview Police Department Detective Kevin Sawyer, Tate directed him around midnight to contact the individual. Sawyer knew of the ongoing investigation, and his understanding was that surveillance units had seen someone "leav[e] the residence" and retrieve a "bag or an item" from a vehicle in the driveway. RP at 13, 17-18. Surveillance units maintained visual contact with Villarreal and guided Sawyer to his location a "couple hundred yards" or about "two blocks" away from the residence. RP at 17, 25. Sawyer's patrol car was an unmarked "white Crown Vic," but was "obviously" recognizable as a "police car" because of its antennas, "push bumper," and spotlight. RP at 14-15. As Sawyer approached in his patrol car, Villarreal looked back directly at Sawyer, made eye contact with him, immediately set a "computer bag" down behind a dumpster, and continued walking away. RP at 14.

Suspecting that either Villarreal was removing evidence related to the investigation from the residence or had stolen the bag, Sawyer activated his patrol car's emergency lights and contacted him. Villarreal continued walking away, so Sawyer exited his vehicle, identified himself, ordered Villarreal to stop, and asked about Villarreal's activities and the bag. After initially stating that he was doing "nothing" and did not know what bag Sawyer was asking about, Villarreal admitted that the bag belonged to him. RP at 18-19. Sawyer asked Villarreal whether anything in the bag could identify him as its owner; Villarreal said, "Yes," and told Sawyer he could search the bag. RP at 18-19. Sawyer informed Villarreal that he did not have to consent to the bag's search and again asked to search the bag, to which Villarreal consented.

Inside the bag, Sawyer discovered three plastic baggies containing 12.9 grams, 20 grams, and 1.4 grams of methamphetamine. Sawyer then read Villarreal his *Miranda*[3] rights; Villarreal waived his rights and stated that he was a drug user, the drugs in the bag belonged to him, and the drugs were for his personal use.

According to Villarreal's friend, Holly West, Villarreal came to her house at 2:00 AM to "catch up" and asked whether she wanted to walk down the street to pick up his bag. RP at 28-30. They walked to a residence, Villarreal retrieved his bag from the truck, and he knocked on the residence's door, but did not enter.

The trial court denied Villarreal's suppression motion. The trial court orally found that it was "not clear" whether Villarreal had left the residence itself or just its driveway and that he had left the residence "somewhere between midnight and two in the morning." RP at 58. Nonetheless, it found that he had retrieved the bag from a vehicle in the driveway of a residence where a "large drug transaction" had occurred "[w]ithin a couple of hours." RP at 58. The trial court orally concluded that these facts justified Villarreal's investigative detention and that Villarreal consented to Sawyer's search of his bag.

After both parties filed their briefing in this case, we remanded to the trial court for entry of written findings of fact and conclusions of law and allowed the parties to submit additional briefing. The trial court entered the following findings of fact:

1. The incident occurred on May 25th, 2010 in the City of Kelso, Cowlitz County, State of Washington.
2. On May 24th, 2010, between 9pm and 10pm, the Cowlitz-Wahkiakum Narcotics Task Force conducted a controlled-buy operation involving a large amount of methamphetamine from Victoria Ortega-Barrera at 99 Home Court, Kelso, Washington.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3. The Task Force left detectives in surveillance at the 99 Home Court address while Detective Sgt. Kevin Tate went to draft a search warrant for that residence, as well as another involved residence.

4. Sometime between midnight and two am, surveillance detectives at 99 Home Court observed a male enter a truck parked in the driveway of the residence, retrieve a bag of some sort, then leave the area.

5. Detective Kevin Sawyer of the Longview Police Street Crimes Unit was detailed to stop and question the person that had entered the truck. Surveillance units kept constant visual contact of the person and guided Detective Sawyer to his location.

6. The person in question was later identified as Jesus VILLARREAL.

7. Detective Sawyer observed VILLARREAL look up and make eye contact with him as he approached in his unmarked white Crown Victoria. Detective Sawyer observed VILLARREAL place, seemingly in response to the eye contact, a black bag behind a garbage can on the sidewalk where he was standing.

8. Detective Sawyer contacted VILLARREAL, who was standing with a female unrelated to the investigation. He asked him what was "going on," and VILLARREAL said, "nothing." When Sawyer asked about the bag, VILLARREAL replied that he did not know anything about the bag. Sawyer asked him again about it and whether the bag was his or stolen. VILLARREAL admitted the bag was his and that he had set the bag down. He also admitted that there were things in the bag that would identify him and told Sawyer that he could check it if he wanted. Sawyer picked up the bag and asked VILLARREAL again if it was okay to search it and told him that he had a right to refuse.

9. Detective Sawyer searched the bag and found approximately 34 grams of methamphetamine.

Supp. Clerk's Papers (Supp. CP) at 1-2. The trial court entered the following conclusions of law:

1. There was sufficient evidence of criminal activity to support a limited <u>Terry</u> detention of VILLARREAL, based on the prior large drug transaction at 99 Home Court, the time of day that VILLARREAL was seen entering the vehicle in the driveway there, and the behavior of attempting to hide the bag he took from 99 Home Court when he spotted Detective Sawyer.

2. VILLARREAL knowingly and intelligently consented to the search of the bag and the circumstances surrounding that consent were not coercive.

Supp. CP at 2.

## II. TRIAL

At trial, Department of Corrections Officer Dustin Pratt testified about being part of the surveillance unit for Ortega-Berrara's residence on May 25, and observing Villarreal "[going] up

to the residence," removing a bag from a vehicle, and walking away. RP at 79-82. According to Pratt, Villarreal was observed by surveillance officers after leaving the residence until he was contacted by a patrol car.

Sawyer testified consistent with his suppression hearing testimony. In addition, he testified that he discovered a police scanner in Villarreal's bag and $1,750 in cash on Villarreal's person, but did not discover any packaging materials, scales, transaction ledgers, or customer lists. According to Sawyer, a normal, single usage amount of methamphetamine was 0.2 grams; the typical amount of methamphetamine possessed by users was between 0.2 and 1.77 grams; and, in his training and experience, he had never encountered anyone in possession of 34.3 grams—the amount possessed by Villarreal—for personal use. Finally, Sawyer testified that the distance between Villarreal's arrest and the perimeter of a local school's grounds measured less than 1,000 feet.

Longview Police Department Detective Timothy Watson also testified as an expert witness on the methamphetamine trade. According to Watson, methamphetamine is generally smuggled into the area from Mexico in pound or quart quantities and broken down into ounces or various fractions of an ounce for dealers. Dealers usually possess one-eighth of an ounce or more of methamphetamine and sometimes use their own supply. Dealers typically do not break down methamphetamine into end user amounts and do not use scales during dealer-to-dealer sales because they could verify the amounts by sight. In Watson's training and experience, individuals were usually found in possession of less than one-eighth of an ounce for personal use, and he had never dealt with anyone in possession of over one-half of an ounce for personal use. Watson opined that nondealer drug users avoid carrying around large amounts of

methamphetamine in order to minimize their risk of being arrested while in possession of it. On cross-examination, Watson testified that drug dealers sometimes possess packaging materials, scales, transaction ledgers, and customer lists and that there would be a stronger inference that someone arrested with both drugs and any of those other items was a drug dealer.

Finally, Villarreal testified that he worked as a mechanic and was typically paid in cash, and the $1,750 in cash he possessed on May 25 was his wages for a week of mechanic work. He also testified that he typically used one-sixteenth to one-eighth of an ounce of methamphetamine per day, he had no intention of selling the methamphetamine he possessed, and the police scanner was a surprise gift from his wife that she had delivered earlier on May 25.

During closing arguments, the prosecutor repeatedly requested that the jury "look at the evidence you have" and argued, "If it walks like a duck and quacks like a duck, Mr. Villarreal intended to sell those drugs." RP at 230. The jury found Villarreal guilty as charged.

## ANALYSIS

### I. EVIDENCE RULES INAPPLICABLE TO SUPPRESSION HEARINGS

Villarreal argues that the trial court erred in ruling that the Washington Rules of Evidence do not apply to suppression hearings and by allowing hearsay testimony at such a hearing. We disagree.

Villarreal's claim involves proper interpretation of evidentiary rules, a question of law, which we review de novo. *State v. Griffin*, 173 Wn.2d 467, 473, 268 P.3d 924 (2012). This court interprets court rules using the same principles that it applies to statutes. *State v. Carson*, 128 Wn.2d 805, 812, 912 P.2d 1016 (1996). A court rule's plain and unambiguous language renders further construction unnecessary, and this court applies the rule as written. *State v.*

*Robinson*, 153 Wn.2d 689, 693, 107 P.3d 90 (2005). Once this court properly interprets the rule, it reviews the trial court's decision to admit or exclude evidence for abuse of discretion. *Griffin*, 173 Wn.2d at 473. A trial court abuses its discretion if its decision "is manifestly unreasonable or rests on untenable grounds." *Griffin*, 173 Wn.2d at 473.

ER 104(a) provides, "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . [i]n making its determination it is not bound by the Rules of Evidence except those with respect to privileges." ER 1101 further provides:

> (c) When Rules Need Not Be Applied. The rules (other than with respect to privileges, the rape shield statute and ER 412) need not be applied in the following situations:
> (1) Preliminary Questions of Fact. The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104(a).

(Emphasis omitted.) Accordingly, our Supreme Court has observed, "It is well established that a trial court is 'not bound by the Rules of Evidence' when it determines questions concerning the admissibility of evidence." *State v. Jones*, 112 Wn.2d 488, 493, 772 P.2d 496 (1989); *see also State v. O'Cain*, 108 Wn. App. 542, 556, 31 P.3d 733 (2001) (citing *Jones* for the proposition that "hearsay is admissible at a suppression hearing.").

Villarreal argues that our Supreme Court's recent decision in *Griffin*, 173 Wn.2d at 467 (quoting ER 104(a)), compels a different result. But *Griffin* is distinguishable from this case. In *Griffin*, our Supreme Court considered whether the Rules of Evidence apply to jury fact-finding

hearings on aggravating factors under RCW 9.94A.537, commonly referred to as the "*Blakely*[4]-fix"[5] statute. *Griffin*, 173 Wn.2d at 475-76. Our Supreme Court held:

> A fact-finding hearing under RCW 9.94A.537, however, is not the sort of "sentencing" hearing to which the evidence rules do not apply. Use of the term "sentencing" in ER 1101(c)(3) predates RCW 9.94A.537, which was crafted to respond to the *Blakely* problem. The statute created a special category of sentencing hearing, which involves jury fact finding (unless a jury is waived). *The trier of fact at a section .537 hearing must find the defendant "guilty" of committing the aggravator.* We do not read the term "sentencing" in ER 1101(c) to encompass this evidentiary hearing under section .537, and thus the long-standing exemption in section (c) does not apply.

*Griffin*, 173 Wn.2d at 475 (emphasis added).

In other words, a jury determines questions of *ultimate* fact—i.e., whether the defendant is "guilty" of committing an aggravating circumstance—at the type of hearing at issue in *Griffin*. In contrast, at a suppression hearing, the trial court determines *preliminary* questions of fact regarding the admissibility of evidence. ER 104(a), 1101(c)(1). Accordingly, neither *Griffin* nor the Rules of Evidence apply to suppression hearings. And because the hearsay testimony was relevant to determining the lawfulness of Villarreal's seizure and the search of his bag, the trial court did not abuse its discretion in admitting the statements. Villarreal's claim fails.

## II. CONFRONTATION CLAUSE INAPPLICABLE TO SUPPRESSION HEARINGS

For the first time on appeal, Villarreal argues that the trial court violated his constitutional right to confront witnesses against him by admitting at the suppression hearing out-of-court statements that an unidentified officer saw Villarreal leave Ortega-Berrara's

---

[4] *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[5] *State v. Eggleston*, 164 Wn.2d 61, 76, 187 P.3d 233 (2008).

residence and retrieve a bag from a vehicle in its driveway. We hold that Villareal fails to demonstrate an issue of constitutional magnitude and, thus, may not raise this issue for the first time on appeal.

RAP 2.5(a) generally does not allow parties to raise claims for the first time on appeal. But RAP 2.5(a)(3) allows appellants to raise claims for the first time on appeal if such claims constitute manifest error affecting a constitutional right. Our Supreme Court has held that a defendant may raise a confrontation clause claim for the first time on appeal if he meets the requirements of RAP 2.5(a)(3). *State v. Kronich*, 160 Wn.2d 893, 899-01, 161 P.3d 982 (2007), *overruled on other grounds by State v. Jasper*, 174 Wn.2d 96, 116, 271 P.3d 876 (2012). In a recent decision, Division One of this court reexamined whether defendants may raise such a claim for the first time on appeal. *State v. O'Cain*, 169 Wn. App. 228, 234, 279 P.3d 926 (2012). After discussing at length the United States Supreme Court's decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), Division One concluded:

> (1) [A] defendant loses the right to confrontation by not objecting to the offending evidence, and (2) states may—by adopting rules applicable to trial court proceedings—govern the means by which defendants may assert the right to confrontation.

*O'Cain*, 169 Wn. App. at 237. Division One held that, under its interpretation of *Melendez-Diaz*, Washington's ER 103, which precludes claims of error "predicated" on rulings admitting or excluding evidence without a timely and specific objection, trumps RAP 2.5(a)(3). *See O'Cain*, 169 Wn. App. at 242-43, 247.

In a subsequent decision, Division One adhered to its decision in *O'Cain*. *State v. Fraser*, 170 Wn. App. 13, 26, 282 P.3d 152 (2012). But the *Fraser* court acknowledged that

RAP 2.5(a)(3) may be a state procedural rule "governing the exercise of confrontation clause objections" permitted by *Melendez-Diaz* and, thus, provided an alternative RAP 2.5(a)(3) analysis. *Fraser*, 170 Wn. App. at 26-27.

Although we acknowledge the *O'Cain* court's holding, we will continue to follow our Supreme Court's holding in *Kronich* until and unless our Supreme Court expressly overrules *Kronich* and holds that confrontation clause claims per se may not be raised for the first time on appeal, regardless of RAP 2.5(a)(3). Thus, we analyze Villarreal's claim under RAP 2.5(a)(3).

To determine whether an error is truly of constitutional dimension, appellate courts first look to the asserted claim and assess whether, if the claim is correct, it implicates a constitutional interest as compared to another form of trial error. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

To establish manifest error allowing appellate review, appellants must demonstrate actual prejudice resulting from the error, i.e., that the error had "'practical and identifiable consequences'" at trial. *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011) (internal quotation marks omitted) (quoting *O'Hara*, 167 Wn.2d at 99). If the asserted error is both of constitutional magnitude and manifest, we determine whether the State has shown that the error is harmless beyond a reasonable doubt. *Gordon*, 172 Wn.2d at 676.

In *State v. Fortun-Cebada*, 158 Wn. App. 158, 167, 171, 241 P.3d 800 (2010), Division One addressed whether the admission of out-of-court statements at suppression hearings implicates a defendant's right to confront witnesses. Division One observed that the United States Supreme Court has held:

> "Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent *from trial* have been admitted only

11

where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."

*Fortun-Cebada*, 158 Wn. App. at 172 (emphasis added) (quoting *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). Division One further observed that nothing in *Crawford* "suggest[ed] that the Supreme Court intended to change its prior decisions allowing the admission of hearsay at pretrial proceedings, such as a suppression hearing." *Fortun-Cebada*, 158 Wn. App. at 172 (citing numerous Supreme Court decisions generally holding that the confrontation clause applies only at trial). Finally, Division One observed that an "overwhelming majority" of state courts that have considered the issue post-*Crawford* have held that the confrontation clause does not apply at pretrial hearings, such as a suppression hearing. *Fortun-Cebada*, 158 Wn. App. at 173.

We hold that the *Fortun-Cebada* court's analysis is persuasive. Because the erroneous admission of out-of-court statements, if any, occurred at a suppression hearing, the error did not implicate Villarreal's right to confront witnesses. Accordingly, because Villarreal fails to demonstrate an error of truly constitutional magnitude, he may not raise the error for the first time on appeal. His claim fails.

### III. LATE ENTRY OF FINDINGS AND CONCLUSIONS

As an initial matter, Villarreal argues that the State tailored the written findings and conclusions entered during the pendency of his appeal. We disagree.

A trial court is required to enter written findings of fact and conclusions of law following its ruling in a CrR 3.6 hearing. CrR 3.6(b). But "[i]t is the general rule in this state that findings and conclusions may be submitted and entered even while an appeal is pending." *State v. McGary*, 37 Wn. App. 856, 861, 683 P.2d 1125 (1984) (citing *State v. Wood*, 68 Wn.2d 303, 412

P.2d 779 (1966)). We will not reverse a conviction based on late-entered CrR 3.6 findings and conclusions unless the delay prejudiced the defendant or the findings and conclusions were tailored to address the issues raised in the defendant's appellate brief. *State v. Cannon*, 130 Wn.2d 313, 329-30, 922 P.2d 1293 (1996).[6]

Villarreal contends that finding 7 demonstrates tailoring because it describes Sawyer's patrol car as an "unmarked white Crown Victoria." Supp. Br. of Appellant at 6-7, 10. But Sawyer testified at the suppression hearing that his car was an unmarked "white Crown Vic." RP at 14-15. Moreover, Villarreal generally argued in his opening and reply briefing that Sawyer at no point had grounds that justified stopping him for an investigative detention; thus, Villarreal's arguments did not depend on *when* Sawyer seized him. Accordingly, the physical appearance of Sawyer's car and the point at which Villarreal recognized it as a law enforcement vehicle is irrelevant to his arguments. Accordingly, Villarreal fails to demonstrate any tailoring, and his claim fails.

Villarreal also argues that the trial court erred in entering findings that do not address (1) "at what point Sawyer activated his flashing lights; that is, at what point Villarreal was seized" and (2) "the facts upon which the court relied in concluding that, at the point of seizure, Sawyer had articulable grounds to believe Villarreal had engaged in criminal conduct." Supp. Br. of Appellant at 12-13.

Although they are silent on when Sawyer activated his emergency lights, findings 7 and 8 indicate that Sawyer "contacted" Villarreal only after Villarreal "made eye contact" with him

---

[6] In his supplemental briefing, Villarreal cites *Cannon* for the proposition that "[a]utomatic reversal is the norm where the written findings are entered subsequent to . . . the State's responding brief." Supp. Br. of Appellant at 6. The citation is not well-taken.

13

and put down the bag. Supp. CP at 1-2. And conclusion 1 states that the evidence supporting a lawful investigative detention included Villarreal's "behavior of attempting to hide the bag he took from 99 Home Court when he spotted Detective Sawyer." Supp. CP at 2. The trial court could not rely on this fact to justify the investigative detention—the type of seizure present in this case—if it concluded that Sawyer had seized Villarreal before he put down the bag. Thus, it follows that the trial court concluded that Sawyer seized Villarreal after that point. Accordingly, the trial court's findings implicitly addressed when the seizure occurred and on which facts it relied in ruling on the investigative detention's lawfulness.

Moreover, as discussed above, Villarreal did not raise or challenge at what point Sawyer activated his emergency lights or otherwise seized Villarreal before we remanded for findings. In fact, his opening and reply briefs stated that the point at which Sawyer activated his emergency lights was *irrelevant* to this case: "Moreover, it makes no difference whether Villarreal put down his bag before, during, or after being signaled to stop with flashing blue lights." Br. of Appellant at 10. We do not consider arguments raised for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Likewise, we will not consider Villarreal's attempts to raise the timing of his seizure for the first time in a supplemental brief.

IV. SUPPRESSION MOTION

Villarreal challenges the trial court's conclusion 1, that his warrantless seizure by Sawyer was a lawful investigative detention. Villarreal further argues that the unlawful seizure and lack of intervening events invalidated his subsequent consent to Sawyer's search of his computer bag. We disagree.

14

When reviewing a trial court's denial of a suppression motion, we review its findings for whether substantial evidence supports them and whether its findings support its conclusions. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Unchallenged findings are verities on appeal. *Hill*, 123 Wn.2d at 644.

Here, Villarreal does not challenge any of the findings, other than finding 7, on the basis that it describes Sawyer's patrol car as an "'unmarked white Crown Victoria.'" Supp. Br. of Appellant at 6-7. As we discuss above, Sawyer's testimony supported this finding. And the remaining unchallenged findings are verities on appeal. We now review the trial court's conclusions of law de novo. *Garvin*, 166 Wn.2d at 249.

Both the Fourth Amendment to the federal constitution and article 1, section 7 of our state constitution prohibit warrantless searches unless one of the narrow exceptions to the warrant requirement applies. *Garvin*, 166 Wn.2d at 249. Article 1, section 7 provides more extensive privacy protections than the Fourth Amendment and creates "'an almost absolute bar to warrantless arrests, searches, and seizures.'" *State v. Buelna Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009) (quoting *State v. Ringer*, 100 Wn.2d 686, 690, 674 P.2d 1240 (1983)).

But seizures are constitutional if they are "reasonable" under the Fourth Amendment and if they are undertaken with "authority of law" under article I, section 7 of the state constitution. Both constitutions permit a warrantless investigative detention whenever a law enforcement officer has a reasonable suspicion, based on specific and articulable facts and rational inferences from those facts, that the stopped person has been or is about to be involved in a crime. *State v.*

15

*Snapp*, 174 Wn.2d 177, 197-98, 275 P.3d 289 (2012) (applying state constitution); *State v. Acrey*, 148 Wn.2d 738, 745-47, 64 P.3d 594 (2003) (applying federal constitution).

In evaluating the reasonableness of an investigative detention, such as what occurred here, we consider "the totality of the circumstances, including the officer's training and experience, the location of the stop, and the conduct of the person detained." *Acrey*, 148 Wn.2d at 747 (footnote omitted).

A.       Lawful Investigative Detention

Villarreal, citing *State v. Doughty*, 170 Wn.2d 57, 239 P.3d 573 (2010), argues that Sawyer lacked a reasonable suspicion of criminal activity necessary for stopping and detaining him.  In *Doughty*, our Supreme Court held that a law enforcement officer lacked a reasonable suspicion of criminal activity when he "merely saw Doughty approach and leave a *suspected* drug house at 3:20 a.m." *Doughty*, 170 Wn.2d at 64 (emphasis added).  Unlike the house in *Doughty*, the house in this case was a confirmed drug house.  But the trial court's findings do not state that Villarreal ever entered the house.  And neither the findings nor the record establish who the truck's registered owner was or whether law enforcement planned to search it as part of the pending warrant in the drug investigation.  Thus, the record fails to establish a clear nexus between the truck and the drug activities inside the residence.  On its own, Villarreal's retrieval of a bag from the truck failed to establish a clear nexus between him and the drug activities inside the house and, thus, reasonable suspicion for an investigative detention.

But Villarreal's subsequent discarding of the bag, coupled with the activity of taking the bag from a vehicle at a known drug house, did justify an investigative detention.  In *State v. Young*, 86 Wn. App. 194, 197, 935 P.2d 1372 (1997), a sheriff's deputy observed Young, a

pedestrian, in a high crime area at night. The deputy performed a social contact and learned Young's name. *Young*, 86 Wn. App. at 197. As the deputy drove away, he performed a criminal records check on Young and learned he had an "extensive criminal background involving drugs." *Young*, 86 Wn. App. at 197. As he looked in his rear view mirror, the deputy then observed Young walking into the street, appearing to check whether the deputy was leaving. *Young*, 86 Wn. App. at 197.

The deputy turned his patrol car to drive back toward Young; as he approached, the deputy activated his car spotlight to illuminate Young and the surrounding area. *Young*, 86 Wn. App. at 197. Young walked rapidly toward some trees and tossed an object, returned to the sidewalk, and resumed a normal pace. *Young*, 86 Wn. App. at 197. The deputy then detained Young and retrieved the object, a half soda can with a charred bottom and containing a substance the officer believed to be "freebased" crack cocaine. *Young*, 86 Wn. App. at 197-98.

After holding that the trial court erred in concluding that Young was seized when illuminated by the deputy's spotlight, not after the deputy ordered him to stop, we considered whether the investigative detention was lawful. *Young*, 86 Wn. App. at 200-01. We held that the investigative detention was lawful because, after dropping the can, "Young's conduct at that point was highly indicative of drug activity." *Young*, 86 Wn. App. at 201. We also observed that the deputy had independent grounds for retrieving the can; because Young dropped it before the deputy seized him, he voluntarily abandoned it. *Young*, 86 Wn. App. at 200-01.

This case is analogous to *Young*. Villarreal's late night retrieval of the bag from the driveway of a residence where a controlled buy of a large amount of methamphetamine had occurred earlier provided some basis for finding Villarreal's activities suspicious. Subsequently,

17

as in *Young*, Villarreal—after observing an approaching police car and making eye contact with an officer—disposed of the bag[7] he had retrieved. At that point, Villarreal's activities were "highly indicative of drug activity" and Sawyer's suspicions of criminal activity became reasonable. *Accord Young*, 86 Wn. App. at 201. Thus, Sawyer's investigative detention of Young was lawful.

Moreover, even if the detention was unlawful, law enforcement officers may search property abandoned by a defendant before the defendant is seized, as such property is voluntarily abandoned. *See State v. Reynolds*, 144 Wn.2d 282, 287-88, 27 P.3d 200 (2001) (property abandoned in response to unlawful police conduct is not voluntarily abandoned). Here, Villarreal dropped the bag before Sawyer seized him, and Sawyer was entitled to search it. *Accord Young*, 86 Wn. App. at 200-01. Villarreal's claim fails.[8]

B.      Consensual Search of Bag

Consent is also an exception to the warrant requirement. *State v. Reichenbach*, 153 Wn.2d 126, 131, 101 P.3d 80 (2004). The trial court's unchallenged finding 8, that Villarreal consented to Sawyer's search of his bag, is a verity on appeal. Villarreal, however, argues that

---

[7] Villarreal, citing to *State v. Lohr*, 164 Wn. App. 414, 263 P.3d 1287 (2011), and *State v. Worth*, 37 Wn. App. 889, 683 P.2d 622 (1984), argues that the fact that he put the bag down was irrelevant. But neither *Lohr* nor *Worth* are applicable here as both cases dealt with whether, during the execution of a search warrant, law enforcement officers may search items clearly belonging to individuals not named in the warrant. *Lohr*, 164 Wn. App. at 423-24.

[8] Villarreal also argues that his detention by Sawyer was an unlawful pretextual stop. But our Supreme Court has observed that the "essence" of every pretextual stop "is that the police are pulling over a citizen, not to enforce the traffic code, but to conduct a criminal investigation unrelated to the driving." *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999). Here, Sawyer's motive for contacting and detaining Villarreal consisted entirely of investigating Villarreal's presence and actions around Ortega-Berrara's residence and his possible connection to the drug activity there. Thus, a pretext analysis is inapplicable here.

Sawyer's unlawful detention of him invalidated his consent to Sawyer's search of the bag. But, as we discuss above, Sawyer lawfully detained Villarreal. Thus, he validly consented to the search, and his claim fails.

V. ADMISSION OF EXPERT TESTIMONY

Villarreal contends that the trial court abused its discretion in admitting Detective Watson's irrelevant expert testimony on methamphetamine dealing, usage and distribution, and Watson's improper opinion testimony. We disagree.

We review the trial court's admission or exclusion of expert testimony for abuse of discretion. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004). "An expert's opinion is admissible if the witness is properly qualified, relies on generally accepted theories, and the expert's testimony is helpful to the trier of fact." *Phillipides*, 151 Wn.2d at 393. Washington courts have repeatedly held that expert testimony about "the arcane world of drug dealing and certain drug transactions" is admissible. *State v. Avendano-Lopez*, 79 Wn. App. 706, 711, 904 P.2d 324 (1995).

Here, Watson generally testified about the quantities in which methamphetamine is imported, the various quantities into which methamphetamine is broken down for dealer-to-dealer transactions, typical behavior during dealer-to-dealer transactions, and the typical amount of methamphetamine possessed by dealers or end users. Watson's testimony was helpful in explaining to the jury, in the context of methamphetamine dealing and usage, the potential significance of the amount of methamphetamine Villarreal possessed. Accordingly, the trial court did not abuse its discretion in admitting Watson's expert testimony.

19

Likewise, Watson did not provide improper opinion testimony. "'[T]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony.'" *State v. Cruz*, 77 Wn. App. 811, 814, 894 P.2d 573 (1995) (quoting *Seattle v. Heatley*, 70 Wn. App. 573, 578, 854 P.2d 658 (1993)). Here, Watson made no direct comments on Villarreal's guilt and placed the evidence within the context of his own knowledge of methamphetamine dealing, information that was useful to the jury.

Finally, even if the trial court abused its discretion in admitting some portions of Watson's testimony, Villarreal cannot claim prejudice. Villarreal cross-examined Watson to establish that drug dealers sometimes possess packaging materials, scales, transaction ledgers, and customer lists and that there would be a stronger inference that someone arrested with both drugs and any of those other items was a drug dealer. Villarreal also established at trial that he possessed none of these items at the time of his arrest. Having chosen to use Watson's expertise to his advantage at trial, Villarreal cannot claim error on appeal. *Avendano-Lopez*, 79 Wn. App. at 711-12; *see also State v. Cunningham*, 93 Wn.2d 823, 832-33, 613 P.2d 1139 (1980). His claims fail.

## VI. SUFFICIENCY OF THE EVIDENCE

Villarreal argues that sufficient evidence does not support his conviction for unlawful possession of methamphetamine with intent to deliver. We disagree.

Sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). On

appeal, we draw all reasonable inferences from the evidence in the State's favor and interpret them most strongly against the defendant. *Hosier*, 157 Wn.2d at 8. In the sufficiency context, we consider circumstantial evidence as probative as direct evidence. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). We may infer specific criminal intent of the accused from conduct that plainly indicates such intent as a matter of logical probability. *Goodman*, 150 Wn.2d at 781. We defer to the fact finder on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970, *abrogated in part on other grounds*, *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Mere possession of a controlled substance, without more, is insufficient to establish possession with intent to deliver. *See, e.g.*, *State v. Hutchins*, 73 Wn. App. 211, 216-17, 868 P.2d 196 (1994); *State v. Brown*, 68 Wn. App. 480, 483, 843 P.2d 1098 (1993); *see also State v. Wade*, 98 Wn. App. 328, 339, 989 P.2d 576 (1999). Likewise, "[a]n officer's opinion of the quantity of a controlled substance normal for personal use" is insufficient to establish intent to deliver. *Hutchins*, 73 Wn. App. at 217. But possession of a large quantity of drugs plus possession of a large amount of cash is sufficient to infer intent to distribute. *State v. Campos*, 100 Wn. App. 218, 223-24, 998 P.2d 893 (2000) (possession of nearly one ounce of cocaine and $1,750 in cash sufficient to demonstrate intent to deliver); *Avendano-Lopez*, 79 Wn. App. at 768-69 (possession of two ounces and 4.7 grams of cocaine and $826.50 in cash sufficient to demonstrate intent to distribute).

Here, Villarreal possessed 34.3 grams of methamphetamine, a large amount that Watson's testimony indicated was more consistent with a dealer than an end user. Additionally,

21

Villarreal possessed $1,750 in cash. Finally, he possessed a police scanner, an item indicating intent to deliver. *See Campos*, 100 Wn. App. at 224 (citing *People v. Robinson*, 167 Ill. 2d 397, 408, 657 N.E.2d 1020 (1995)). Taken together, this evidence sufficiently supported a rational inference that Villarreal possessed the methamphetamine with intent to deliver it. His claim fails.

## VII. PROSECUTORIAL MISCONDUCT

Villarreal contends that the prosecutor misstated the presumption of innocence and committed misconduct during closing by arguing that "if it walks like a duck and quacks like a duck, . . . Mr. Villarreal intended to sell [those] drugs." Br. of Appellant at 29-31.

A defendant claiming prosecutorial misconduct must show both improper conduct and resulting prejudice. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). A prosecutor has wide latitude to comment on the evidence introduced at trial and to draw inferences from that evidence. *Fisher*, 165 Wn.2d at 747.

In making his argument, the prosecutor requested that the jury "look at the evidence you have." RP at 230. Accordingly, the prosecutor merely argued that the evidence demonstrated an inference that Villarreal possessed the methamphetamine with intent to deliver. Such an argument was proper, and Villarreal's claim fails.

## VIII. SCHOOL ZONE SENTENCING ENHANCEMENT

Villarreal finally argues that RCW 69.50.435(1)(d), the school grounds sentencing enhancement statute, is unconstitutional as applied to him. We choose to discuss his claim, even though his preservation of the issue is slight and his discussion is minimal.

First, Villarreal fails to specify what constitutional provision the sentencing enhancement violates and what type of constitutional challenge he brings. His briefing instead focuses on the legislative intent[9] underlying the statute. But RAP 10.3(a)(6) requires appellants to support assignments of error with relevant argument and citations to authority. Moreover, "[p]arties raising constitutional issues must present considered arguments to this court." *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992). "'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *Johnson*, 119 Wn.2d at 171 (internal quotation marks omitted) (quoting *In re Request of Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986)). And "we are not in the business of inventing unbriefed arguments for parties sua sponte." *State v. Studd*, 137 Wn.2d 533, 547, 973 P.2d 1049 (1999). Thus, his briefing is insufficient because he does not address the nature of the alleged constitutional violation.

Nevertheless, it appears that Villarreal makes an equal protection challenge. But our Supreme Court has rejected such a challenge to RCW 69.50.435(1)(c), the school bus route stop sentencing enhancement statute. *State v. Coria*, 120 Wn.2d 156, 173, 175, 839 P.2d 890 (1992). In doing so, the *Coria* court reasoned:

> It is no doubt true that children are present at school bus route stops only at specific times. Nonetheless, if drug dealers were allowed to become established near the stops, then it would be impossible to keep them away from those locations only when children are actually present. To keep the dealers away from the stops at specific times, it may rationally be supposed that it is necessary to

---

[9] Villarreal cites *United States v. Coates*, 739 F. Supp. 146 (S.D.N.Y. 1990), for the proposition that a federal court found a similar school zone sentencing enhancement statute "unconstitutional as applied." Br. of Appellant at 28. But the *Coates* court held that, based on the statute's legislative intent, it did not apply to the facts in that case. *Coates*, 739 F. Supp. at 152-53. Because the *Coates* court determined that the sentence enhancements should be dismissed on grounds of statutory interpretation, it declined to reach the appellant's constitutional overbreadth challenge. *See Coates*, 739 F. Supp. at 153 n.1. Accordingly, *Coates*, as a case of federal statutory interpretation, is inapplicable here.

No. 42315-4-II

keep them away from the stops at all times. The statute's classificatory scheme may thus be viewed as an instrument, although perhaps a blunt one, furthering its end. The classification is not "purely arbitrary", as it would have to be if this court were properly to strike it down under the rational basis test.

*Coria*, 120 Wn.2d at 173 (quoting *Omega Nat'l Ins. Co. v. Marquardt*, 115 Wn.2d 416, 431, 799 P.2d 235 (1990)). Likewise, the *Coria* court's reasoning applies to school grounds enhancements under RCW 69.50.435(1)(d): although children may not be always present on or around school grounds, the legislature may rationally conclude that keeping drug dealers away from school grounds at all times is necessary to keep them away at specific times. Accordingly, to the extent Villarreal challenges RCW 69.50.435(1)(d) on equal protection grounds, his challenge fails.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Bridgewater, J.P.T.

We concur:

Johanson, A.C.J.

Wiggins, J.

24